# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | |
| --- | --- | --- |
| | : | |
| | : | |
| v. | : | |
| | : | |
| MARKCUS GOODE | : | CRIMINAL No. 11-204-1 |
| PROMISE MEBRTATU | : | -2 |
| MILAN DOUGLAS | : | -3 |

# M E M O R A N D U M

PRATTER, J.                                                                                                                          DECEMBER 16, 2011

Markcus Goode, Promise Mebrtatu and Milan Douglas stand charged with conspiracy to commit bank fraud and aggravated identity theft, along with substantive crimes of bank fraud and aggravated identity theft.[1] They seek to suppress "all physical evidence seized during a January 3, 2011 vehicle search and all physical evidence seized directly from [them] following their subsequent arrest," as well as "any and all statements made to Vermont officers during their . . . detention."

Having conducted an evidentiary hearing at which the Court received testimony[2] of the primary law enforcement officer involved in the vehicle stop and the operative subsequent events, and having weighed the vigorous oral and written advocacy of all counsel, the Court concludes that the suppression motion should be denied.

---

[1]Their co-defendant Jessica Randolph is likewise charged in this case, but Ms. Randolph has not joined in the pending suppression motion.

[2]The hearing occurred on December 1, 2011. Citations to the testimony received that day will be reflected as "N.T. at __."

**BACKGROUND FACTS**

Trooper Christopher Lora of the Vermont State Police testified at the suppression hearing. He was the sole witness presented by the Government. Trooper Lora testified that on January 3, 2011 at just past 4:30 p.m. he saw a late model Dodge Charger (with North Carolina license plate, QXN 2052) traveling south on Interstate Highway 91. Most importantly for present purposes, he saw that the car had an electronic GPS device mounted on the car's windshield, something that amounts to a violation of Vermont law which forbids affixing obstructions on windshields. N.T. at 6-7.

Trooper Lora testified that he stopped the car and approached it on the passenger side (i.e., on the side of the stopped car not directly exposed to the highway traffic) to speak with the driver, Markcus Goode. N.T. at 7. He states that he explained the reason for the stop and then asked to see Mr. Goode's driver's license, registration and related papers and inquired where the group in the car was coming from. N.T. at 8. According to Trooper Lora, Mr. Goode's response that he was coming "from Philadelphia" struck the Trooper as odd (given that the car was southbound, i.e., *toward* Philadelphia).[3] N.T. at 8-10. According to Trooper Lora, this answer was particularly discordant, given other responses Mr. Goode soon gave to the Trooper's

---

[3]The entire interaction between Trooper Lora and Mr. Goode was videotaped, including a recording of the verbal communications. The Court concludes that Trooper Lora's account of the exchange as presented during the suppression hearing was consistent in all material respects with the filmed recording. The actual words exchanged were somewhat garbled on the videotape recording because of the Interstate 91 traffic whizzing by the patrol car and Defendant's car at the time of the events and exchanges at issue. Given the background noise, it is entirely possible that Mr. Goode's response was to a question he might have thought was "Where are you from?" ["Philadelphia"]. However, Trooper Lora's actual question - - and, hence, his good faith wariness at the answer when coupled with other aspects of Mr. Goode's statements and the situation generally - - was "Where are you coming from ?" Thus, it is possible that both of them are "right."

questions.

Trooper Lora explained that he informed Mr. Goode of the Vermont law about windshield obstructions and stated that he would issue Mr. Goode a warning. N.T. at 11. The Trooper then asked Mr. Goode to get out of the car and sit in the patrol car while he, the Trooper, prepared the warning paperwork. N.T. at 10-12. Although during the hearing Trooper Lora acknowledged that it was not necessarily standard procedure for him to invariably ask a driver to join him in a patrol car in relation to getting a warning about a windshield obstruction, the Trooper testified that to do so was easier for him generally and, additionally, in this case, he had some developing concerns about Mr. Goode that further prompted him to want to talk more with Mr. Goode. N.T. at 35-36; 48-49. By the same token, Trooper Lora says he did explain to Mr. Goode that he did not have to get into the patrol car.[4] N.T. at 11-12.

Nonetheless, Mr. Goode did, in fact, get out of the rental car and joined Trooper Lora at the back of the car where Trooper Lora then explained to Mr. Goode that before Mr. Goode could get into the police car the Trooper asked that he, Mr. Goode, consent to a pat-down search. N.T. at 11-12. After being reminded that he need not consent, Mr. Goode did indeed agree and, apparently on his own initiative, even placed his hands on and leaned onto the top of his car trunk while Trooper Lora patted him down. N.T. at 36. Until this point, as appears from the videotape, Trooper Lora had not touched Mr. Goode. According to Trooper Lora, this pat down was standard safety protocol before a layman gets into the police car under these circumstances. N.T. at 11. As a result of the pat down, Trooper Lora recovered from Mr. Goode cash totaling

---

[4]The Trooper also confirmed that once in the police car, Mr. Goode was free to get out of the patrol car if he wished.

approximately $1500 and two cell phones, one of which had no battery or SIM card. N.T. at 12; 37. Based on his years of police work, Trooper Lora found the particular condition of the disabled cell phone to be suspicious, N.T. at 12, and, as such, one of a growing number of things he found unsettling about the stop of the Goode car. Another puzzling or suspicious aspect of the travelers' situation was, again according to Trooper Lora, the significant gap in ages between Mr. Goode and Misses Mebrtatu and Douglas on the one hand and Ms. Randolph (who was, to the Trooper's eye, considerably older than the other three) on the other.[5] N.T. at 13-14.

At this point during the stop Trooper Lora made more inquiries of Mr. Goode concerning the Dodge Charger Mr. Goode was driving. He learned the car had been rented from Dollar Car Rental in Philadelphia by a relative of Mr. Goode's who had loaned him the rental car. N.T. at 15-16. Mr. Goode's name was not on the rental agreement.[6] As reflected on the video tape of the stop, Mr. Goode, in response to the Trooper's inquiries, described one of the passengers in

---

[5]The defense ascribes a considerably more problematic reason for the Trooper's distinction between the three younger people (all of whom are African American) and the older car passenger (who is a Caucasian). The Court, at the very conclusion of the hearing, pointedly asked defense counsel what significance, if any, the defense was endeavoring to make of the racial facts developed by the defense by cross-examining Trooper Lora on the racial characteristics of the car's inhabitants. N.T. at 99, et seq. Defense counsel responded that the defense was indeed trying to make a claim that Trooper Lora's "suspicions" were racially motivated and represented unconstitutional profiling or other discriminatory conduct on the law enforcement officer's part. The only "evidence" to support such an accusation was the information just recounted, i.e., the individuals' respective races. Based on the evidence presented, including the tenor and demeanor of Trooper Lora, as well as the video tape of the actual stop, the Court finds that the simple demographic information is not nearly enough to mount such a charge concerning the Trooper's motivation - - especially in the face of an alternate explanation by the Trooper that, based on the Court's direct observation, appeared entirely candid and plausible.

[6]Ms. Charmaine Mitchell, the relative - - Mr. Goode's niece - - who rented the car and loaned it to Mr. Goode, testified later during the hearing. N.T. at 54, et seq.

4

the car, "Promise," who was in the front seat of the car, as his girlfriend of about eight months but whose surname Mr. Goode could not recall. Mr. Goode then described one of the women in the backseat - - whose name he could not recall at all - - as his "girl on the side." This prompted Trooper Lora to guffaw and rhetorically wonder aloud how "that" works, in response to which Mr. Goode also chuckled in what amounted to a kind of verbal shrug. Indeed, again, as observable on the video, the demeanor and overall character of Trooper Lora in his interactions with Mr. Goode and with the car passengers was entirely non-aggressive, not at all intimidating but, instead, virtually avuncular and basically friendly, respectful and entirely professional.

While Mr. Goode was in the patrol car Trooper Lora asked him if he had ever been in trouble. In reply, Mr. Goode explained that he did indeed have a prior arrest record. N.T. at 16. By this point, Trooper Lora testified, he saw that Mr. Goode was becoming agitated and sweaty and that his answers were more labored and slower in coming. N.T. at 16. Coupled with various "odd" answers by Mr. Goode to his questions,[7] Trooper Lora began to suspect Mr. Goode was trying to hide something. Consequently, the Trooper testified, he asked Mr. Goode if he would object to Trooper Lora searching the car. N.T. at 17-18.

Before undertaking to search the car, however, Trooper Lora asked several times if Mr. Goode would consent to having the car searched. He even asked if Mr. Goode or the passengers had "anything foolish" in the car, or anything the Trooper "should be worried about." N.T. at 18. Mr. Goode repeatedly said no, there was nothing problematic in the car, and, although he would

---

[7]At times during these preliminary discussions, as additional examples the Trooper gave as reasons for becoming more suspicious of Mr. Goode, Mr. Goode said he was coming from North Carolina and that he was driving around looking at (unnamed) schools in Vermont and New Hampshire. N.T. at 15; 17; 34; 38-40.

5

not sign the written consent form for such a search, he would provide consent for the search of the car. N.T. at 18. As reflected on the video tape recording, Mr. Goode either remained silent in the face of Trooper Lora's statement that he wanted permission to search the car or he gave verbal consent for the search of the car. Certainly, more than once, and by no means with obvious distress, reluctance, confusion or resentment, he verbally indicated his permission. However, Mr. Goode drew a line at signing a written authorization for the police to search the car because, he explained at the time to Trooper Lora, his lawyer had told him never to sign anything. N.T. at 18; 42. Trooper Lora was unsuccessful in his several efforts to get Mr. Goode to sign the written consent for the car search. However, as reflected on the video, and as testified by Trooper Lora, Mr. Goode did give his verbal consent for the car search.

By that point, Sgt. Eric Albright (who was working with Trooper Lora that day) had arrived and began to participate with the Trooper in the next series of events. N.T. at 18-19. Before starting the search, Trooper Lora informed the three passengers of the car that he would be searching the car. He asked if they objected, and no objections were made. Asked for identification as part of this process, Ms. Mebrtatu tendered a New Jersey driver's license in the name of Deanna Denby. All of this proceeded following standard police procedures.

The car search resulted in the recovery of three different checkbooks from the front passenger area, latex gloves, and rubbing alcohol. Photocopies of processed checks were found in the sunglasses holder, wrapped around several Pennsylvania driver's licenses, the names of which matched the names on the processed checks but the pictures on which were all photographs of car passenger Jessica Randolph. Money wrappers for $1000 bundles also were recovered. Two Pennsylvania identification cards were recovered from Ms. Mebrtatu's purse.

6

Ms. Randolph's purse, found in the backseat, contained heroin. Finally, in the trunk, a Rite Aid bag containing three containers of Krazy Glue and a bottle of isopropyl alcohol wipes were found. N.T. 20-24.

Following the on-site car search, the four travelers were told they were going to be taken to the Vermont State Trooper barracks. Subsequent searches at the barracks led to recovery of $9100 from Ms. Douglas and $7000 from Ms. Mebrtatu.

**DISCUSSION**

Defendants challenge Trooper Lora's search of the car. As an initial matter, the Court agrees with the Government's opening argument that, under governing Third Circuit case law, Defendants all lack standing to challenge the search of this rental car because none of them was listed on the rental agreement as an authorized driver. See United States v. Kennedy, 638 F.3d 159, 165-168 (3d. Cir. 2011); United States v. Baker, 221 F.3d 438, 441-42 (3d Cir. 2000) (citing Rakas v. Illinois, 439 U.S. 128, 133-34 (1978)). Thus, in the absence of extraordinary circumstances - - of which, the Court concludes, there are none presented here - - none of the Defendants traveling in the car on Interstate 91 through Vermont at the time of Trooper Lora's stop of this car had any reasonable expectation of privacy. Therefore, none of them had standing to challenge the search undertaken by Trooper Lora.

Moving beyond that threshold issue, however, the suppression motion substantively fails because, based upon the results of the evidentiary hearing, the Court concludes from the totality of the circumstances, Trooper Lora's search of the car followed Mr. Goode's voluntarily and

freely given oral consent.[8] See Schneckloth v. Bustamonte, 412 U.S. 218, 226-228, 248-49 (1973); United States v. Givan, 320 F.3d 452, 459-60 (3d Cir. 2003).

The defense argues that Trooper Lora's friendly and respectful demeanor was so much so as to be actually and literally disarming and, hence, violative of Mr. Goode's exercise of his free will. The Court declines to entertain an argument (or cynicism, generally) that would lead to a finding that politeness and good humor on the part of law enforcement officers can be subject to such alchemy as to unconstitutionally eviscerate the will power and intelligence of a fully functional adult. It is difficult to imagine the precise admonition that would have to be given to police officers to explain that they should beware of being "too nice" lest the exclusionary rule be invoked. Such a situation would set on its head the truism that more flies are caught with honey than with vinegar.

However one might resolve the courtesy question, even if Mr. Goode's consent had been obtained invalidly (which, the Court concludes it was not), Trooper Lora's warrantless search of the car was still authorized. In short, Trooper Lora was permitted to search the Dodge Charger

---

[8]The Court's conclusion in this regard stems from the Court's close observation and listening to the video taped interactions between Trooper Lora and Mr. Goode. At no time during the stop did Mr. Goode appear confused, unable to communicate, impeded in processing information or distressed in any way that interfered with his cognitive abilities. He appeared mature; his responses to Trooper Lora, while puzzling in substance to the Trooper, were not inappropriate in the sense of being incoherent. He displayed no difficulty in hearing or understanding Trooper Lora. For his part, Trooper Lora comported himself politely and in an entirely professional, but low-key, manner. Moreover, he repeated several times at each stage in his interactions with Mr. Goode that Mr. Goode did NOT have to assent to the Trooper's request(s). In particular, Trooper Lora stated multiple times that Mr. Goode need not consent to the search. Indicative of the respect and absence of intimidation shown to Mr. Goode, Mr. Goode's refusal to sign a written search consent did not lead to any change in the demeanor of Trooper Lora. Moreover, his declination to sign a written consent showed that Mr. Goode was fully in control of his decision-making faculties. It shows he realized he was not obliged to do whatever the officer asked him to do as they interacted on the side of the highway.

on the strength of the authorization to conduct a warrantless search of an automobile that the police reasonably suspect may contain evidence of illegal activity. Wyoming v. Houghton, 526 U.S. 295, 303-04 (1999); United States v. Ross, 456 U.S. 798, 825 (1982); United States v. Burton, 288 F. 3d 91, 100-01 (3d Cir. 2002). Trooper Lora testified that once Mr. Goode began to provide implausible answers to basic questions, was unable to provide the names of his traveling companions (not to mention his supposed romantic partners), and appeared increasingly nervous and sweaty during their verbal exchange, coupled then with finding two cell phones on Mr. Goode (one of which had the SIM card and battery removed - - familiar indicia, according to Trooper Lora, of a desire to conceal information contained on a cell phone), then Trooper Lora had probable cause to suspect Mr. Goode was conveying contraband in the car and, hence, to search it.

**CONCLUSION**

Accordingly, the items recovered by Trooper Lora and his police officer colleague, Sgt. Albright, during their search of the Dodge Charger were not improperly seized by the officers. The defense motion to suppress will be denied. An order to that effect accompanies this Memorandum.

BY THE COURT:


/s/ Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge